UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GRAY TELEVISION GROUP, INC.

                              Plaintiff,

     -against-

FOUND FOOTAGE FESTIVAL, LLC,
NICK PRUEHER, AND
JOE PICKETT,

                              Defendants.

Case No. 1:17-cv-2232-MKB-SMG

## ANSWER

For its Answer to the Complaint filed by Plaintiff Gray Television Group, Inc. ("Plaintiff"),

Defendants ("Found Footage") denies each and every allegation except as admitted or qualified as

follows:

## NATURE OF THE ACTION

1.       This action seeks to recover damages incurred by Gray Television as a result of

Defendants' fraudulent activities and copyright infringement.

**Answer:**  This paragraph states legal conclusions to which no response is required.

2.       Using fake names and materials, Defendants fraudulently induced Gray Television

station WEAU in Eau Claire, Wisconsin, to book their appearance for a live interview on its flagship

morning program *Hello Wisconsin*.  Defendants Prueher and Pickett appeared on the program as the

fake "strongman duo Chop & Steele," and performed ridiculous bits and provided false information to

WEAU viewers.

**Answer:**  Defendants admit that they appeared on *Hello Wisconsin* as the characters Chop & Steele.

Defendants deny the remaining allegations in this paragraph.

3.       Defendants intentionally defrauded the station for the purpose of misappropriating its

production resources to advertise the Found Footage Festival brand, merchandise, website, and

upcoming live shows.  As Prueher and Pickett have made clear in subsequent interviews the purpose

of perpetrating this fraud was not "driving a big point home."  They were "just trying to entertain [them]selves" and decided that local broadcast stations were "easy to exploit."

**Answer:**  Defendants admit only that the quoted excerpts are technically accurate but taken out of context and misrepresent Defendants' intention as explained in the full article and many subsequent interviews.  Defendants deny the allegations in paragraph 3 insofar as they characterize Defendants' acts as fraudulent and claim to explain their motivations in creating the characters Chop and Steele.

4.      Defendants have further willfully infringed Gray Television's copyrighted video of their appearance on *Hello Wisconsin* as the fake "strongman duo Chop & Steele" by depicting or selling their WEAU appearance in a sizzle reel available on Found Footage Festival's website, sold in DVDs, and played in live performances.

**Answer:**  Defendants admit that the total amount of footage showing the characters Chop and Steele on *Hello Wisconsin* used by Found Footage in its live show and DVD totals eighty (80) seconds and that miniscule amount of footage is split into five (5) segments ranging from six (6) to twenty (20) seconds mixed into a montage of other related footage not owned by Gray Television.  Specifically, these segments last for six (6), seventeen (17), eighteen (18), nineteen (19), and twenty (20) seconds. Defendants further admit that the total amount of footage showing the characters Chop and Steele on Hello Wisconsin used by Found Footage on the montage it posted online, which is not a sizzle reel insofar as that phrase has specific meaning in the industry, is thirty-three (33) seconds split into five (5) segments ranging from five (5) to nine (9) seconds.  Specifically, these segments last for five (5), six (6), seven (7), and nine (9) seconds, with two segments lasting six (6) seconds.  Defendants deny the remaining allegations.

## PARTIES

5.      Plaintiff Gray Television is a Delaware corporation with its principal place of business in Atlanta, Georgia. Gray Television owns more than 90 television stations across the United States, including WEAU in Eau Claire, Wisconsin, and WSAW in Wausau, Wisconsin.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 5 and therefore deny the same.

6.      Defendant Found Footage Festival, LLC ("Found Footage Festival"), is a New York

limited liability company having its principle place of business within this judicial district at 11-58 49th

Avenue, #3F, Long Island City, New York, 11101.

**Answer:**  Admitted.

7.      Defendant Nick Prueher is a "co-founder" of Found Footage Festival. Upon information

an belief, he resides within this judicial district at 11-58 49th Avenue, #3F, Long Island City, New

York 11101.

**Answer:**  Admitted.

8.      Defendant Joe Pickett is a "co-founder" of Found Footage Festival. Upon information an

belief, he resides within this judicial district at 77 Carroll St., Apt. 1, Brooklyn, NY 11231.

**Answer:**  Admitted.

## <u>JURISDICTION AND VENUE</u>

9.      This action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*, and New

York state law. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367.

**Answer:**  This paragraph states legal conclusions to which no response is required.

10.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1367.

**Answer:**  Defendants admit that venue is properly founded in this judicial district.

## <u>ALLEGATIONS</u>

11.      Gray Television owns television station WEAU in Eau Claire, Wisconsin.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in

paragraph 11 and therefore deny the same.

12.      For more than sixty years, WEAU has served as the trusted and respected news source

in Western Wisconsin.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in

paragraph 12 and therefore deny the same.

13.      WEAU was first licensed to broadcast in the area by the Federal Communications

Commission in 1953. Since then, it has continuously served as the local NBC-affiliate and maintained

its FCC broadcasting license in good standing.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 13 and therefore deny the same.

14.     As part of its continuing commitment to bringing accurate information to its viewers and remaining an industry leader, in 1979 WEAU became the first television station in the market to have its own Doppler weather radar.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 14 and therefore deny the same.

15.     Using its trademark "WEAU 13 News" (Reg. No. 4,308,151), the station currently broadcasts in high definition digital from its studios in Eau Claire to more than 206,000 homes in La Crosse and in Eau Claire.

**Answer:**  Defendants admit only that Plaintiff is the listed registrant for federal trademark Registration No. 4,308,151 for WEAU 13 NEWS for "[e]ntertainment in the nature of on-going television programs in the field of news, sports, weather, ***comedy***, variety and drama; entertainment in the nature of television news shows; news reporter services in the nature of news analysis and news commentary; providing information in the field of world news, local current event news, and national current event news; providing news in the nature of current event reporting; television show production" in Class 41.  Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in paragraph 15 and therefore deny the same.

16.     The station's News Team includes a News Director, 22 anchors, journalists, photojournalists, and producers, a three-person Weather Team, a two-person Sports Team, and a 12-person production crew. In addition, a Creative Services Director and four-person creative services team, as well as nearly a dozen sales personnel assist in all aspects of the station's 24/7 operations.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 16 and therefore deny the same.

17.     WEAU regularly produces six newscasts on weekdays and three on weekends, including the weekday morning program *Hello Wisconsin*. WEAU also produces the *Moms Everyday*

program that airs daily after *Hello Wisconsin*. Additionally, the station produces specials from time-to-time on particular issues of interest to the community, such as a town hall during the last gubernatorial election that was broadcast on all television stations across the state.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 17 and therefore deny the same.

18.     WEAU also produces weeknight and weekend newscasts for Fox affiliates WLAX/WEUX.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 18 and therefore deny the same.

19.     WEAU is also frequently hired by clients who pay the station to use its considerable production resources to produce and broadcast advertisements and other special programming.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 19 and therefore deny the same.

20.     WEAU has also licensed its programming for a fee to commercial entities seeking to use the station's work in their productions.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 20 and therefore deny the same.

21.     In 2014, WEAU proudly debuted its morning news and talk program *Hello Wisconsin*. The program airs weekdays from 4:30 a.m. to 7 a.m.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 21 and therefore deny the same.

22.     The program's name—"Hello Wisconsin"—is a registered trademark of Gray Television (Reg. No. 4,560,940) and has been synonymous with WEAU in the community for most of the station's sixty years of broadcasting.

**Answer:**  Defendants admit only that Plaintiff is the listed registrant for federal trademark Registration No. 4,560,940 for HELLO WISCONSIN for "[t]elevision broadcasting" in Class 38. Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in

paragraph 22 and therefore deny the same.

23.     Since *Hello Wisconsin*'s debut, WEAU has dedicated considerable resources to developing the program's brand and to increasing viewership, ratings and advertising revenue. It now is the leading morning program in the area. The station derives advertising revenue both from the live broadcast of the program and from advertisements on the *Hello Wisconsin* webpage on WEAU's website where many of the program's segments are posted after broadcast. The *Hello Wisconsin* webpage garners millions of hits every month.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 23 and therefore deny the same.

24.     The *Hello Wisconsin* production staff includes the News Director, the Creative Services Director, two full-time producers, two anchors, a meteorologist, two directors, a master control specialist, a utility operator, and a promotion and camera operator.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 24 and therefore deny the same.

25.     Planning for each two-and-a-half hour episode begins more than a month in advance. Each *Hello Wisconsin* episode is separately written, produced and directed and constitutes a separate copyrighted work as a television motion picture. It is the product of the *Hello Wisconsin* staff's journalistic and creative skills, editorial discretion, and WEAU's extensive production resources.

**Answer:**  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 25 and therefore deny the same.

26.     The live program provides local and national news and weather reports, as well as live interviews and demonstrations featuring topics of interest to the community. Recent live features on *Hello Wisconsin* have included an interview with a local high school graduate who is biking more than 4,225 miles cross country to raise $10,000 for Save the Children—an aid organization dedicated to assisting starving Syrian refugee children, and an interview with local professionals who started the "Real Life Academy"—a free program to prepare high school students to manage their personal finances.

**Answer:** Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 26 and therefore deny the same.

27.     Found Footage Festival was founded in New York in 2004 by Nick Prueher and Joe Pickett.

**Answer:** Admitted.

28.     The company markets "found footage"—odd clips from old videotapes and home movies that Prueher and Pickett have found or have purchased in garage sales or thrift stores.

**Answer:** Defendants admit that Found Footage Festival transforms and recontextualizes found footage to develop unique creative works that are protected by copyright.

29.     Clips from these videotapes and home movies are posted to Found Footage Festival's website, foundfootagefest.com, where the company sells advertising space "for as little as $10/day." *See* http://www.foundfootagefest.com/contact/.

**Answer:** Defendants admit that Found Footage Festival sells its unique and transformative works of audio-visual art on its website and at <foundfootagefest.com>, which also sells advertising space to fund its ongoing creative and artistic mission.

30.     Found Footage Festival also sells these clips, for download from its website or in DVD format, for $5 to $48. Additionally, Found Footage Festival merchandise available for purchase on its website includes DVDs, mugs, t-shirts and books.

**Answer:** Defendants admit that Found Footage Festival sells its unique and transformative works of audio-visual art on its website <foundfootagefest.com>, which also sells DVDs, mugs, t-shirts, and books to fund its ongoing creative and artistic mission.

31.     Found Footage Festival has also held hundreds of live shows across the country to play these "found footage" clips to paying, sold-out crowds in the U.S., Canada, and the United Kingdom.

**Answer:** Defendants admit the allegations in this paragraph to the extent that they refer to Defendants' use of unique, transformative creative works incorporated into their live performance art shows.

32.     Found Footage Festival's shows can also be booked for a fee to appear at cities, venues, special events, and even college campuses. Found Footage Festival also advertises for paid

sponsorships for its tours on its website.

**Answer:**  Admitted.

33.     In addition to the business it has built displaying and performing "found footage,"
Found Footage Festival's website, merchandise, and live shows also feature recordings of Prueher's
and Pickett's fraudulent appearances on various morning programs.

**Answer:**  Defendants admit only that they have built a business centered on their creative works of
audio-visual art and that one of these art pieces includes a few seconds of footage from appearances on
a variety of morning television shows.  Defendants deny the remaining allegations in paragraph 33.

34.     In 2014, Prueher appeared on various morning programs, including Gray Television
station WSAW in Wausau, Wisconsin, as "Chef Keith Guerke" ostensibly to promote his new
cookbook "Leftovers Right: Making A Winner of Last Night's Dinner." There is no such book.  There
was never any such book.

**Answer:**  Defendants admit that Prueher appeared on various morning television shows in 2014,
including WSAW, as the character Chef Keith Geurke and that the book referenced in paragraph 34
does not exist.

35.     During his appearances, "Chef Keith" offered recipes like mashed-potato ice-cream
cones, feigned concern that "between Thanksgiving and Christmas [is] one of the highest suicide rates
and I think part of that is the stress of what are you going to do with these leftovers," and tipped over
his demonstration table—food and all—live on air.

**Answer:**  Admitted.

36.     At no time before or after "Chef Keith's" prank appearance did Prueher, Pickett, or
anyone from Found Footage Festival, provide their true identities or purpose to WSAW.

**Answer:**  Defendants admit that they provided WSAW with a stage name and obviously ridiculous
character description for the character that appeared, whose performance was consistent with the
character description provided to WSAW.

37.     At no time has Found Footage Festival requested permission to use footage of "Chef
Keith's" appearance on WSAW.

**Answer:** Admitted.

38. Nevertheless, the recording of "Chef Keith's" appearance on WSAW, and the other morning programs, is featured in a three-minute sizzle reel that has been posted since March 2014 on Found Footage Festival's website (http://www.foundfootagefest.com/2014/03/fake-chef-pranks-morning-tv-shows/) and on Found Footage Festival's YouTube page (https://www.youtube.com/watch?v=3335KNFYK1I) where it has accumulated nearly 2 million views. The reel was also played during Found Footage Festival's live shows, and is available for purchase from its website as part of the "Plumb Awesome Combo: Volumes 1-7 + Free Digital Downloads" package of DVDs for $48 (https://store.foundfootagefest.com/collections/dvds/products/combo-pack-volumes-1-7).

**Answer:** Defendants admit that a few seconds of each appearance on several morning news shows are juxtaposed in a transformative, creative montage available at the URLs stated in paragraph 38 and that a few seconds of footage were featured in a roughly ninety (90)-minute DVD and during Found Footage Festival's live shows.  Defendants deny that they ever produced a "sizzle reel," which has a specific meaning in the industry.

39. On March 4, 2014, WSAW sent Found Footage Festival a cease and desist notice requesting that it remove from its website and DVDs the unauthorized recording of Chef Keith's appearance on WSAW. Found Footage Festival ignored the demand and has continued to profit from its fraudulent misappropriation of WSAW's production resources and unauthorized use of WSAW's video on its website, on other websites, in its merchandise, and in its live shows.

**Answer:** Defendants admit that WSAW sent a meritless cease and desist letter on March 4, 2014. Defendants deny the remaining allegations in paragraph 39.

40. More recently, in advance of the release of the "The Found Footage Festival Vol. 8" DVD and live tour, Prueher and Pickett again engaged in their fraudulent behavior by inducing employees of three morning programs, including WEAU's *Hello Wisconsin*, to book their appearances as the fake "strongman duo Chop & Steele."

**Answer:** Defendants admit only that Prueher and Pickett appeared on several morning television

shows that failed to conduct basic due diligence, including *Hello Wisconsin*, as the characters Chop and Steele, who performed exactly as advertised.  Defendants deny the remaining allegations in paragraph 40.

41.    On November 16, 2016, a person identifying himself as "Jerry Chubb," and purporting to be the representative of "strongman duo Chop & Steele," emailed the *Hello Wisconsin* anchors separately, asking each of them for WEAU's "help to promote our shows in Northwestern Wisconsin." The e-mails are attached as Exhibit A.

**Answer:**  Admitted.

42.    On information and belief, "Jerry Chubb" is a fictitious name and no one by that name exists or represents Prueher, Pickett, or Found Footage Festival.

**Answer:**  Defendants admit that Jerry Chubb is an over-the-top stage name that directly clashes with and draws attention to the obvious stage names Chop and Steele.

43.    On information and belief, Prueher and Pickett using the fake name "Jerry Chubb" sent the false emails to WEAU.

**Answer:**  Defendants admit only that Prueher and Pickett, in character as Jerry Chubb, sent emails to WEAU.  Defendants deny the remaining allegations in paragraph 43.

44.    In the e-mails, "Jerry Chubb" explained that "Chop & Steele" were on their "Give Thanks 4 Strengths" tour and would be in Eau Claire on November 28 for a couple of performances. He stated that Steele was a Wisconsin native, and that the duo's show focused on "ways to unify people, how to prevent bullying, and how to generally be a 'good dude.'" He attached to the email a "press release" with "more details." The press release is attached as Exhibit B.

**Answer:**  Admitted.

45.    The press release identified Joe Picket by the fake name "Joe 'Chop' Shopsin" and Nick Prueher by the fake name "Nicholas 'Steele' Stelling." It stated that the duo would perform "a series of free live events in Black River Falls, LaCrosse, Eau Claire, and Winona the week of November 28, using their muscles to entertain and educate" on unity, inner strength, and ways to prevent bullying "through humor, courage and self-respect." The press release further claimed that

"Chop & Steele" were "fan favorites from season three of *America's Got Talent*," and were also featured on Steve Harvey, the Hallmark Channel's *Marie*, and Disneyland's 60th Anniversary Celebration.

**Answer:** Admitted.

46.     The information in the press release was entirely false. Prueher and Pickett were not on a "Give Thanks 4 Strengths" tour. They did not have any events scheduled in Wisconsin or elsewhere. They had not appeared on *America's Got Talent*, Steve Harvey, the Hallmark Chanel or in Disneyland.

**Answer:** Defendants admit that the characters Chop and Steele did not appear on *America's Got Talent*, Steve Harvey, the Hallmark Channel, or at Disneyland.  Defendants deny the remaining allegations in paragraph 46.

47.     Believing the information provided in the email and press release, a WEAU anchor enthusiastically responded the same day to "Jerry Chubb" stating that "*Hello Wisconsin* would LOVE to have Chop and Steele" on the program and asked for more details to prepare  for their interview and demonstration.  *See* Exhibit A.

**Answer:** Defendants admit only that a WEAU anchor responded to the email referenced in paragraph 47.  Defendants deny the remaining allegations in paragraph 47.

48.     "Jerry Chubb" replied asking for outdoor space, closing the message: "We're excited!" *See* Exhibit A.

**Answer:** Admitted.

49.     On Monday, November 28—the day before their appearance—"Jerry Chubb" e- mailed a *Hello Wisconsin* anchor letting him know that "Chop & Steele" had "a quick radio interview at 5:45 am" not far from the studio but should have no problem making it to WEAU's studio in time for their live interview. "Jerry Chubb" also asked for the studio's address. *See* Exhibit A.

**Answer:** Admitted.

50.     That was also false. Neither Prueher nor Pickett, as themselves or as "Chop & Steele," appeared on any local radio programs on the morning of November 29 prior to their appearance on *Hello Wisconsin*.

**Answer:** Admitted.

51.      On Tuesday, November 29, 2016, Prueher and Pickett arrived at WEAU's studios alone. Prueher identified himself as "Nicholas 'Steele' Stelling" and Pickett identified himself as "Joe 'Chop' Shopsin" at all times.

**Answer:** Defendants admit that Prueher and Pickett remained in character for the duration of their appearance on *Hello Wisconsin* as was advertised in the press release sent to WEAU.

52.      During the live appearance on *Hello Wisconsin*, "Chop" and "Steele" touted their "mental strength," "Chop" discussed the violent outbursts he was prone to while abusing steroids and his wealthy upbringing, while "Steele" discussed his "body image issues" and his impoverished upbringing. They then demonstrated "activities that really anybody can do to promote strength," like slamming tennis rackets against each other until they broke. They boasted that in their live shows the tennis rackets are on fire when they do the demonstration. "Chop & Steele" also demonstrated "resistance training" where Chop got on the floor and "lifted some 'Steele,'" and an exercise that was nothing more than hitting a used tire with a bat.  To close out their live interview, "Chop & Steele" promoted their live show that evening at the  Best Western Plus.

**Answer:** Admitted.

53.      There was no such show planned for that evening. No such show took place that evening.

**Answer:** Admitted.

54.      Gray Television has registered the *Hello Wisconsin* episode where "Chop & Steele" appeared with the U.S. Copyright Office. A valid Certificate of Registration issued by the Register of Copyrights for the "*Hello Wisconsin*, Episode of November 29, 2016" is attached as Exhibit C.

**Answer:** Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 54 and therefore deny the same.

55.      During all of their communications with WEAU, Prueher and Pickett used false names. Neither they, nor Found Footage Festival, explained the true purpose of the duo's visit to WEAU at any time before or after they appeared on *Hello Wisconsin*.

**Answer:**  Defendants admit that Prueher and Pickett used obvious stage names during their communications with WEAU and other morning news stations, but deny the remaining allegations in paragraph 55.

56.     In March 2017, Prueher and Pickett were interviewed by *Esquire* magazine about their promotional stunt as "Chop & Steele."  The article is attached as Exhibit D.

**Answer:**  Defendants admit that Prueher and Pickett were interviewed by *Esquire* magazine about their performance art piece utilizing the characters Chop and Steele.

57.     In the article, Prueher and Pickett described crafting and sending out the fake "Chop & Steele" press release to unsuspecting stations. They explained that they originally had planned to induce seven stations but ended up only appearing on three because of the stress of "feel[ing] like you could get arrested afterwards."

**Answer:**  Admitted.

58.     The duo further explained in the *Esquire* article that they perpetrated these fraudulent acts because local broadcast morning programs are "easy to exploit" and they were "bored on tour." As Pickett summed up:  "I don't think we're driving a big point home. We're just trying to entertain ourselves."

**Answer:**  Defendants admit only that the quoted excerpts are accurate but misrepresent Defendants' intention as explained in the full article.  Defendants deny the allegations in paragraph 58 insofar as they characterize Defendants' acts as fraudulent and claim to explain their motivations in creating the characters Chop and Steele.

59.     As with the fraudulent "Chef Keith" appearance on WSAW, Prueher and Pickett created a three-minute sizzle reel of their fraudulent appearances on the morning shows as "Chop & Steele" (herein after "the 'Chop & Steele' Reel").

**Answer:**  Defendants admit only that a few seconds of footage showing the characters Chop and Steele appearing on a variety of morning television shows were incorporated into a unique, transformative, and creative montage.  Defendants deny the remaining allegations in paragraph 59.

60.     Found Footage Festival publicized the release of the reel on its Twitter account

directing followers to visit the website at 9 am ET for "something big."

**Answer:** Admitted.

61. The "Chop & Steele" Reel includes video from the duo's appearance on *Hello Wisconsin*, and separately also features video of *Hello Wisconsin*'s opening title.

**Answer:** Defendants admit that a few seconds of footage showing the characters Chop and Steele on *Hello Wisconsin* are juxtaposed with footage from many other shows to create a new expressive work of art.

62. It was posted to various websites including YouTube, eBaum's World, Vimeo, and Found Footage Festival's website.

**Answer:** Insofar as paragraph 62 acknowledges that many of these videos were posted by third parties, the allegations in paragraph 62 are admitted.

63. The "Chop & Steele" Reel ends by directing viewers to "See more at foundfootagefest.com."

**Answer:** Admitted.

64. The "Chop & Steele" Reel is included in "The Found Footage Festival Vol. 8" DVD available for $18 on Found Footage Festival's website (https://store.foundfootagefest.com/products/found-footage-festival-volume-8).

**Answer:** Admitted.

65. On information and belief, Found Footage Festival featured the "Chop & Steele" Reel, including the duo's appearance on *Hello Wisconsin*, in its recent live shows in the United Kingdom.

**Answer:** Admitted.

66. It will also be featured in Found Footage Festival's upcoming shows in the United States, including two shows in Eau Claire on April 19. Tickets for the upcoming shows range from $10 to $40.

**Answer:** Admitted.

67. Gray Television has never granted, and Found Footage Festival, Prueher and Pickett have never requested, its permission to include in the "Chop & Steele" Reel any portion of WEAU's

copyrighted morning program *Hello Wisconsin.*

**Answer:** Admitted.

68.     Pursuant to the Digital Millennium Copyright Act ("DMCA"), WEAU sent takedown requests for the removal of the "Chop & Steele" Reel to YouTube on March 21, March 22, March 23, and April 3.

**Answer:** Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 68 and therefore deny the same.

69.     WEAU also sent a DMCA takedown request for the removal of the "Chop & Steele" reel to eBaum's World on March 22, and to Vimeo on March 21.

**Answer:** Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 69 and therefore deny the same.

70.     On March 22, WEAU sent a letter to Found Footage Festival, Prueher and Pickett demanding that they cease and desist from using any portion of the video of their appearance on WEAU in their sizzle reel and in their live shows. The letter asked that they confirm by March 31 that they had complied with the demands in the letter. A copy of the letter is attached as Exhibit E.

**Answer:** Admitted.

71.     Despite Gray Television's efforts to resolve this matter, Defendants have failed to comply with its demands.

**Answer:** Defendants admit that they have not complied with Plaintiff's wholly unreasonable demands.  Defendants deny that Plaintiff has made good faith efforts to resolve this matter.

72.     WEAU has not granted to Found Footage Festival any rights in or to the recording of "Chop & Steele's" appearance on *Hello Wisconsin*.

**Answer:** Admitted.

73.     WEAU licenses clips of its programs, including *Hello Wisconsin*, for a fee.

**Answer:** Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 73 and therefore deny the same.

74.     Found Footage Festival is profiting commercially from its willful infringement of the

clip of "Chop & Steele's" appearance on *Hello Wisconsin*.

**Answer:**  Defendants deny the allegations in paragraph 74.

75.     Found Footage Festival's unauthorized reproduction, public performance and public display of the clip on various websites, in its DVD, and in its live shows has damaged Gray Television in an amount to be determined according to proof at trial.

**Answer:**  Defendants deny the allegations in paragraph 75.

76.     Upon information and belief, unless enjoined by this Court, Found Footage Festival intends to continue to infringe upon Gray Television's copyright and otherwise profit from its work.

**Answer:**  Defendants deny the allegations in paragraph 76.

77.     Accordingly, Gray Television has suffered irreparable damage and will continue to suffer such damage until Found Footage Festival's actions are enjoined by this Court.

**Answer:**  Defendants deny the allegations in paragraph 77.

78.     Gray Television has further been damaged by Prueher's and Pickett's fraudulent appearance on *Hello Wisconsin* as "Joe 'Chop' Shopsin" and "Nicholas 'Steele' Stelling."

**Answer:**  Defendants deny the allegations in paragraph 78.

79.     To assuage their boredom and promote their tour and Found Footage Festival, Found Footage Festival, Prueher and Pickett misappropriated WEAU's valuable production resources and air time.

**Answer:**  Defendants deny the allegations in paragraph 79.

80.     The duo's fake appearance and false information provided both to the station to induce the station to book their appearance and to viewers during the live interview caused damage to WEAU in an amount to be determined according to proof at trial.

**Answer:**  Defendants deny the allegations in paragraph 80.

<u>**CLAIMS FOR RELIEF**</u>

<u>**COUNT I**</u>

**(Copyright Infringement (17 U.S.C. § 101 *et seq.*) against Defendant Found Footage Festival)**

81.     Gray Television repeats and re-alleges each and every allegation above as if fully set

forth herein.

**Answer:** Defendants' responses to the allegations in paragraphs 1 through 80 are adopted and incorporated by reference as if fully set forth herein.

82. The "*Hello Wisconsin,* Episode of November 29, 2016" in which "Chop & Steele" made their fraudulent appearance is an original, creative work copyrightable under the laws of the United States.

**Answer:** Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 82 and therefore deny the same.

83. As established by the Certificate of Registration attached as Exhibit C, Gray Television is the owner of a valid copyright in the "*Hello Wisconsin,* Episode of November 29, 2016."

**Answer:** Defendants admit only that Plaintiff is the listed owner shown in Exhibit C. Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in paragraph 83 and therefore deny the same.

84. Gray Television has complied in all respects with 17 U.S.C. §§ 101 *et seq.*, and has secured the exclusive rights and privileges in and to the copyright in the "*Hello Wisconsin,* Episode of November 29, 2016."

**Answer:** Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 84 and therefore deny the same.

85. By its actions, as alleged above, Found Footage Festival has infringed and will continue to infringe Gray Television's copyright in and relating to the "*Hello Wisconsin,* Episode of November 29, 2016" by, *inter alia*, reproducing, distributing, publicly performing, and publicly displaying the work without any authorization or other permission from Gray Television.

**Answer:** Defendants deny the allegations in paragraph 85.

86. Found Footage Festival's infringement of Gray Television's copyrights has been deliberate and willful.

**Answer:** Defendants deny the allegations in paragraph 86.

87.     As a direct and proximate result of its wrongful conduct, Found Footage Festival has

obtained benefits including but not limited to advertising revenue from its website, revenue from

tickets sold to its live performances, and revenue from DVD sales to which it is not entitled.

**Answer:**  Defendants deny the allegations in paragraph 87.

88.     As a direct and proximate result of Found Footage Festival wrongful conduct, Gray

Television has been substantially and irreparably harmed in an amount not readily capable of

determination. Unless restrained by this Court, Found Footage Festival will cause further irreparable

injury to Gray Television.

**Answer:**  Defendants deny the allegations in paragraph 88.

89.     Gray Television is entitled to injunctive relief enjoining Found Footage Festival, its

agents and employees, and all persons acting in concert or participation with it, from engaging in any

further infringement of Gray Television's copyright.

**Answer:**  Defendants deny the allegations in paragraph 89.

90.     Gray Television is further entitled to recover from Found Footage Festival the actual

damages it has sustained and will sustain, and any gains, profits and advantages obtained

by Found Footage Festival as a result of its acts of infringement as alleged above, in an amount to be

established according to proof at trial.

**Answer:**  Defendants deny the allegations in paragraph 90.

## COUNT II

### (Fraud against Defendants Found Footage Festival, Nick Prueher, and Joe Pickett)

91.     Gray Television repeats and re-alleges each and every allegation above as if fully set

forth herein.

**Answer:**  Defendants' responses to the allegations in paragraphs 1 through 90 are adopted and

incorporated by reference as if fully set forth herein.

92.     Defendants Prueher and Pickett willfully, falsely, and fraudulently presented

themselves to *Hello Wisconsin* as "Joe 'Chop' Shopsin," "Nicholas 'Steele' Stelling," and the

"strongman duo Chop & Steele" for the purpose of misappropriating WEAU's valuable production

resources and the *Hello Wisconsin* program to create promotional material for Found Footage Festival.

**Answer:**  Defendants deny the allegations in paragraph 92.

93.     They knowingly and intentionally used the fictitious name "Jerry Chubb" to act as "Chop & Steele's" representative and induce the station to book Prueher's and Pickett's appearance as "Chop & Steele" on the program. Through "Jerry Chubb," Prueher and Pickett knowingly and intentionally provided false information about "Chop and Steele's" credentials including claiming that the duo were "fan favorites from season three of *America's Got Talent*," and were featured on Steve Harvey, the Hallmark Channel's *Marie* and Disneyland's 60th Anniversary Celebration. They further falsely claimed the duo was also appearing on local radio stations to promote their "Give Thanks 4 Strengths Tour" prior to their appearance on *Hello Wisconsin*.

**Answer:**  Defendants admit only that they provided obviously exaggerated information about the characters Chop, Steele, and Jerry Chubb.  Defendants deny the remaining allegations in paragraph 93.

94.     They also knowingly and intentionally provided fake information about their "Give Thanks 4 Strengths Tour," including that their show presented on "ways to unify people, how  to prevent bullying, and how to generally be a 'good dude,'" and that they wanted to promote their upcoming free shows in Black River Falls, La Crosse, Eau Claire, and Winona.

**Answer:**  Defendants deny the allegations in paragraph 94 insofar as it characterizes the information provided by the characters Chop and Steele as "fake."

95.     Prueher and Pickett committed the aforementioned acts with malice for the purpose of misappropriating the station's production resources to assuage their boredom and create promotional material for Found Footage Festival's website, merchandise, and upcoming shows.

**Answer:**  Defendants deny the allegations in paragraph 95.

96.     Prueher and Pickett intended for WEAU to rely on their false statements about "Chop & Steele's" purported credentials and the fake "Give Thanks 4 Strengths" tour to book them on the program so that they could carry out their promotional stunt on live television.

**Answer:**  Defendants deny the allegations in paragraph 96.

97.     The staff of *Hello Wisconsin* were unaware that "Jerry Chubb" was a fictitious person

and that the information he was providing to them about "Chop & Steele" was false.

**Answer:** Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 97 and therefore deny the same.

98.     The staff of *Hello Wisconsin* did reasonably rely on the knowingly false information Prueher and Pickett provided to them and booked "Chop & Steele" on the program.

**Answer:** Defendants deny the allegations in paragraph 98.

99.     Prueher and Pickett did appear as "Chop & Steele" on the program.

**Answer:** Admitted.

100.     As a direct result of Defendants' fraudulent conduct set forth herein, Gray Television has been damaged and is entitled to recover compensatory damages in an amount which shall be proved at trial.

**Answer:** Defendants deny the allegations in paragraph 100.

101.     Defendants' actions and the injuries inflicted against Gray Television as set forth herein were reckless, intentional, knowing, malicious and willful, and entitle Gray Television to a recovery of punitive damages against Defendants in an amount to be determined at trial.

**Answer:** Defendants deny the allegations in paragraph 101.

## COUNT III

### (Conspiracy to commit tortious activity against Defendants Found Footage Festival, Nick Prueher, and Joe Pickett)

102.     Gray Television repeats and re-alleges each and every allegation above as if fully set forth herein.

**Answer:** Defendants' responses to the allegations in paragraphs 1 through 101 are adopted and incorporated by reference as if fully set forth herein.

103.     As alleged above, Found Footage Festival, Prueher and Pickett intentionally and maliciously agreed to cooperate in, and did cooperate in, a scheme to defraud Gray Television station WEAU and the staff of *Hello Wisconsin* for the purpose of misappropriating WEAU's resources to create promotional materials for the Found Footage Festival website, merchandise, and live shows.

**Answer:** Defendants deny the allegations in paragraph 103.

104.    In furtherance of their conspiracy, Defendants used a fictitious name—"Jerry Chubb"—to transmit false information and a fake press release to induce the station to book "Chop & Steele" on *Hello Wisconsin*.

**Answer:** Defendants deny the allegations in paragraph 104.

105.    The staff of *Hello Wisconsin* did book "Chop & Steele" to appear on the live program and Prueher and Pickett did appear on the program as "Chop & Steele."

**Answer:** Admitted.

106.    Defendants have individually profited from their fraudulent appearance as "Chop & Steele" on WEAU earning revenue from publicity resulting from their fraudulent appearance, and earning revenue from their unauthorized recording of that appearance through advertising on their website, merchandising, and in live shows, as discussed above.

**Answer:** Defendants admit only that they have earned a modest amount of revenue by selling a roughly ninety (90)-minute creative work that incorporates a few seconds of footage showing the characters Chop and Steele appearing on WEAU.  Defendants deny the remaining allegations in paragraph 106.

107.    As a direct result of Defendants' conspiracy as set forth herein, Gray Television has been damaged and is entitled to recover compensatory damages in an amount which shall be proved at trial.

**Answer:** Defendants deny the allegations in paragraph 107.

108.    Defendants actions and the injuries inflicted against Gray Television as set forth herein entitle Gray Television to a recovery of punitive damages against Defendants in an amount to be determined at trial.

**Answer:** Defendants deny the allegations in paragraph 108.

## **FURTHER ANSWER AND AFFIRMATIVE DEFENSES**

By way of further Answer and as affirmative defenses, Defendants deny that they are liable to Plaintiff on any of the claims alleged and further deny that Plaintiff is entitled to damages, punitive

damages, equitable relief, attorneys' fees, costs, pre-judgment interest, or to any relief whatsoever and

state as follows:

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

1.      Plaintiff's Complaint, on one or more of the counts set forth therein, fails to state a

claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Non-Infringement)

2.      Defendants have not infringed any applicable copyright under federal or state law.

### THIRD AFFIRMATIVE DEFENSE
### (Fair Use)

3.      Plaintiff's claim for copyright infringement is barred because Defendants' use of a

few seconds of footage from *Hello Wisconsin* in a much longer work is a fair use of such footage.

### FOURTH AFFIRMATIVE DEFENSE
### (De Minimis Use)

4.      Plaintiff's claim for copyright infringement is barred because the Complaint alleges

only de minimis use of the underlying work.

### FIFTH AFFIRMATIVE DEFENSE
### (Copyright Misuse)

5.      Plaintiff's claim for copyright infringement is a thinly veiled attempt at chilling

Defendants' speech and is therefore barred by the doctrine of copyright misuse.

### SIXTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

6.      The allegations set forth below in Counterclaim paragraphs 1 through 34 are adopted

and incorporated by reference as if fully set forth herein.  Plaintiff's claims are barred by the doctrine

of unclean hands.

### SEVENTH AFFIRMATIVE DEFENSE
### (No Damage)

7.      Without admitting that the Complaint states a claim, there has been no actionable

damage in any amount or of any nature caused by any act alleged against Defendants in the Complaint,

and Plaintiff's requested relief therefore cannot be granted.

**EIGHTH AFFIRMATIVE DEFENSE**
**(Failure to Plead Fraud with Particularity)**

8.　　Plaintiff has not and cannot adequately plead facts meeting the heightened pleading standard required for fraud.

**ADDITIONAL DEFENSES**

9.　　Defendants reserve the right to assert additional defenses based on information learned or obtained during discovery.

**DEFENDANTS' COUNTERCLAIM**

**SUMMARY OF ACTION**

1.　　This action seeks to recover damages incurred by the willful and malicious misuse of the notice and takedown procedure provided in the Digital Millennium Copyright Act ("DMCA"), which have had a chilling effect on protected speech and undermined the goals of the Copyright Act.

**THE PARTIES**

2.　　As stated in the Complaint in paragraph 5, Counterclaim Defendant Gray Television Group, Inc. ("Gray Television") is a sophisticated corporate entity that "owns more than 90 television stations across the United States . . . ."

3.　　Counterclaim Plaintiff Found Footage Festival, LLC ("Found Footage") is a New York limited liability company with its principle place of business in New York.

4.　　Counterclaim Plaintiff Joe Pickett is a co-founder of Found Footage and is an individual residing in Brooklyn.

5.　　Counterclaim Plaintiff Nick Prueher is a co-founder of Found Footage and is an individual residing in Queens.

**JURISDICTION AND VENUE**

6.　　This action arises under 17 U.S.C. § 512(f).

7.　　This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338.

8.　　Venue is appropriate in this judicial district by virtue of 28 U.S.C. § 1391.

**FACTS**

9.　　Pickett and Prueher began collecting found footage as high school friends in Wisconsin

and continued developing their fascination with audio-visual cultural artifacts through their years at the University of Wisconsin-Eau Claire.

10.     In 2004, Pickett and Prueher proudly debuted the Found Footage Festival to fund the production of the documentary *Dirty Country*, which focuses on small town America and specifically the country musician Larry Pierce, whose lyrics may be described as raunchy.  The documentary *Dirty Country* focuses on cultural norms in the United States and asks, in part, whether people in the United States have a sense of humor.

11.     In 2015, David Letterman's staff donated VHS archives spanning more than thirty (30) years of the late night show's history.

12.     Found Footage regularly tours across the country with a live show.  Prueher told the New York Daily News that they thought "it would be funny and interesting to see if" obviously fake characters would be booked by morning news shows in the cities where Found Footage stopped on its tour.

13.     Prueher and Pickett appeared on several morning news shows in character as Chop and Steele, including WEAU's *Hello Wisconsin*.

14.     Prueher and Pickett sent a press release offering the characters Chop and Steele to a morning show on WQOW-TV in Eau Claire, Wisconsin on the same date as their appearance on WEAU's *Hello Wisconsin*, but did not appear on that morning news program because WQOW fact checked the press release and could not verify the obviously exaggerated and easily disproven statements made therein.

15.     Prueher and Pickett used the email address jchubb@thanks4strengths.com to communicate with WEAU in character as Jerry Chubb, an obvious pseudonym.

16.     No website or content of any kind existed at the domain <thanks4strengths.com> at any point during Prueher and Pickett's contact with WEAU, and no content exists at that domain to this day.

17.     The day after their appearance on *Hello Wisconsin*, one of its anchors emailed Prueher and Pickett writing "well-played you guys."

18.     Upon information and belief, *Hello Wisconsin* is a news program that spans a two (2)-hour (or seven thousand two hundred (7,200) second) period.

19.     The total amount of footage showing the characters Chop and Steele on *Hello Wisconsin* used by Found Footage in its live show and DVD totals eighty (80) seconds and that miniscule amount of footage is split into five (5) segments ranging from six (6) to twenty (20) seconds mixed into a montage of other related footage not owned by Gray Television.  Specifically, these segments last for six (6), seventeen (17), eighteen (18), nineteen (19), and twenty (20) seconds.

20.     The total amount of footage showing the characters Chop and Steele on *Hello Wisconsin* used by Found Footage on the montage it posted online is thirty-three (33) seconds split into five (5) segments ranging from five (5) to nine (9) seconds.  Specifically, these segments last for five (5), six (6), seven (7), and nine (9) seconds, with two segments lasting six (6) seconds.

21.     The miniscule amount of footage used from *Hello Wisconsin* is used to comment on *Hello Wisconsin* and illustrate how easy it is for obvious misinformation to be spread by legitimate news outlets.

22.     The use of footage from *Hello Wisconsin* in Found Footage materials has no negative impact on the market for the original material aside from its protected criticism of the original material.

23.     Found Footage did not use any more footage of the Chop and Steele appearance on *Hello Wisconsin* than was necessary to critique the show.

24.     The CBS television show, The Talk, reporting on Gray Television's lawsuit, stated that "It is hard to believe [WEAU was] not suspicious when [it] heard the body builders were named Chop and Steele."

25.     In an interview with Twin Cities Pioneer Press, Prueher stated "If [WEAU] had done [its] due diligence, that I feel like is the responsibility of a news organization, [it] would have known this was a goof, but you know, they didn't."

26.     The initial email and press release pitching the characters Chop and Steele to WEAU contained obvious exaggerations and falsehood that would have been discovered with a simple online search.

## COUNT I
### (Bad faith misrepresentations made pursuant to 17 U.S.C. § 512(f))

27.     Upon information and belief, Gray Television is a sophisticated media company with in-depth knowledge of copyright law and the fair use doctrine.

28.     Upon information and belief, Gray Television knowingly made material

misrepresentations to several internet service providers ("ISPs") by stating that Counterclaim Plaintiffs'

creative works infringed on its own intending to induce the ISPs to remove Counterclaim Plaintiffs'

creative works, which are protected by copyright, from the internet.

29.     Upon information and belief, Gray Television made such material misrepresentations in

bad faith and with an intentional blind eye to the doctrine of fair use.

30.     Upon information and belief, Gray Television actually knew or should have known if it

had acted in good faith that it was making material misrepresentations at the time it issued each

takedown notice asserting that Counterclaim Plaintiffs' works infringed on Gray Television's asserted

copyright.

31.     Upon information and belief, Gray Television knowingly abused the notice and takedown

procedure of the DMCA to chill speech that was critical of its morning television shows.

32.     Gray Television's intentional misuse of the Copyright Act to chill speech undermines the

stated purpose of the Copyright Act.

33.     As a direct result of Gray Television's knowing bad faith misrepresentations under 17

U.S.C. § 512(f), Counterclaim Plaintiffs have been injured in an amount to be determined at trial.

34.     An award of attorneys' fees and costs is needed in this case to deter Gray Television from

future bad faith misuse of copyright law to chill speech and to mitigate the chilling effect Gary

Television's actions have already had through the widespread coverage of this lawsuit in national media.

WHEREFORE, Defendants/Counterclaim Plaintiffs pray for judgment as follows:

1.     Granting Gray Television nothing by way of its Complaint;

2.     Dismissing Gray Television's Complaint with prejudice;

3.     Finding that Defendants/Counterclaim Plaintiffs' acts as described in the pleadings

constitute a fair use of the underlying material;

4.     Finding that Defendants/Counterclaim Plaintiffs' acts as described in the pleadings do

not give rise to a claim of copyright infringement as a matter of law;

5.      Finding that Defendants/Counterclaim Plaintiffs' acts as described in the pleadings constitute a de minimis use of the underlying material;

6.      Finding that Gray Television violated § 512(f) when submitting takedown notices under the DMCA;

7.      Finding that Gray Television's Complaint asserts frivolous claims to chill speech;

8.      Finding that Gray Television's Complaint asserts claims that undermine the goals of the Copyright Act;

9.      Finding that Defendants/Counterclaim Plaintiffs are not liable for fraud under New York common law;

10.     Awarding Defendants/Counterclaim Plaintiffs its reasonable attorneys' fees and costs in accordance with 17 U.S.C. § 505;

11.     Awarding Defendants/Counterclaim Plaintiffs all damages sustained by them as a result of Gray Television's violation of § 512(f);

12.     Awarding Defendants/Counterclaim Plaintiffs prejudgment interest; and

13.     Awarding Defendants/Counterclaim Plaintiffs such other relief as the Court may deem just and proper.

## **DEMAND FOR A JURY**

Defendants/Counterclaim Plaintiffs demand a jury trial of all issues so triable.

Dated:  May 19, 2017                              Respectfully submitted,


                                        /s/ Anderson J. Duff_____
                                        The Law Offices of Anderson J. Duff, PLLC
                                        Anderson J. Duff (AD2316)
                                        244 5th Ave., Suite 2230
                                        New York, NY 10001
                                        (T) (212) 996-4103
                                        (F) (212) 996-5863

                                        *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2017, I caused to be served copies of the foregoing upon all attorneys of record by electronic means through the Court's ECF system.

/s/ Anderson J. Duff

Anderson J. Duff