UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GRAY TELEVISION GROUP, INC.,

                    Plaintiff,

          - against -

FOUND FOOTAGE FESTIVAL, LLC, NICK
PRUEHER, and JOE PICKETT,

                    Defendants.

Case No. 17-cv-02232-MKB-SMG

---

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL
SUMMARY JUDGMENT**

---

# TABLE OF AUTHORITIES

**CASES**

*AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 Fed.Appx. 2, 5 (2d Cir. 2016)......................................................11

*Antidote Intern. Films, Inc. v. Bloomsbury Pub., PLC*, 467 F. Supp. 2d 394, 400 (S.D.N.Y. 2006)..................passim

*Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) ...........................................................................................passim

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994) ........................................................................passim

*Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013)................................................................................................14

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) ............9, 10

*Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 307 (2d Cir. 1986) ..........................................................................11

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984) ......................................3, 4, 8

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12-CV-5354 (KAM)(RLM), 2014 WL 1311979, at
   *8 (E.D.N.Y. March 28, 2014).............................................................................................................................1, 3

*Johnson v. Riverhead Cent. Sch. Dist.*, 14-CV-7130 (DRK)(AKT), 2015 WL 6438788, at *6 (E.D.N.Y. October 21,
   2015)...........................................................................................................................................................................2

*Kane v. Comedy Partners*, 2003 WL 22383387 (S.D.N.Y. 2003), *aff'd*, 98 F. App'x 73 (2d Cir. 2004) ............passim

*Kane v. Comedy Partners*, No. 00 CIV. 158(GBD), 2003 WL 22383387, at *4 (S.D.N.Y. Oct. 16, 2003), *aff'd*, 98 F.
   App'x 73 (2d Cir. 2004) .............................................................................................................................................16

*Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1264 (2d Cir. 1986) ....................................................................19

No. 02 Civ.1312 (LMM), 2002 WL 31426310, at *5 (S.D.N.Y. Oct. 29, 2002) ......................................................10

*Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997), *aff'g*, 927 F. Supp. 650 (S.D.N.Y. 1996)
   ...............................................................................................................................................................................2, 3, 4, 5

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ................................................................9, 10

*Shields*, 25 F.3d at 1130 .............................................................................................................................................9

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014) .........................................1, 13, 17, 18

**FEDERAL STATUTES**

17 U.S.C. § 107 ........................................................................................................................................13, 17, 18, 19

**TREATISES**

2 Howard B. Abrams, *The Law of Copyright*, § 15:52 (2006) ..................................................................................17

**CONSTITUTIONAL PROVISIONS**

U.S. Const., art. I, § 8, cl. 8 ........................................................................................................................................13

**8**

3 Boswell's Life of Johnson 19 (G. Hill ed. 1934)....................................................................................................14

JT Leroy, *Sarah* (Bloomsbury 2001) (2000)...............................................................................................................6

Leval, *Toward a Fair Use Standard*, 103 Harv.L.Rev. 1105, 1111 (1990)................................................................14

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................................................. **1**

**STATEMENT OF UNCONTESTED FACTS** ........................................................................... **1**

**ARGUMENT** ....................................................................................................................... **2**

    **I.**    **Plaintiff's Claim for Fraud Fails** ........................................................................ **2**

        A.    Plaintiff Cannot Show Justifiable Reliance on Any Alleged Material Misrepresentation or

        Omission of a Material Fact ............................................................................................. 3

        B.    Plaintiff Cannot Show a Misrepresentation or Omission of a Material Fact.............................. 8

        C.    Plaintiff Cannot Show that Defendants Made Any Misrepresentations of Fact or Omitted Any

        Facts with the Requisite Fraudulent Intent ..................................................................... 9

        D.    Plaintiff Cannot Show Damages of the Type Fraud Prevents..................................... 11

    **II.**    **Plaintiff's Copyright Infringement Claim Fails** ...................................................... **12**

        A.    There is No Colorable Claim of Copyright Infringement Once Fair Use is Considered.............. 12

**CONCLUSION** ..................................................................................................................**20**

## PRELIMINARY STATEMENT

The Second Circuit recognizes that many copyright claims are ripe for dismissal on summary judgment despite plaintiffs' requests for further discovery. *See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014); *Kane v. Comedy Partners*, 2003 WL 22383387 (S.D.N.Y. 2003), *aff'd*, 98 F. App'x 73 (2d Cir. 2004). The Eastern District of New York recognizes that an alleged claim of fraud will fail as a matter of law if a plaintiff cannot demonstrate reasonable reliance. *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12-CV-5354 (KAM)(RLM), 2014 WL 1311979, at *8 (E.D.N.Y. March 28, 2014). The record in this case shows that any alleged copyright infringement is a fair use. It also shows that Plaintiffs did not reasonably rely on any material misrepresentations to their detriment. Because a claim for conspiracy cannot stand without an underlying claim, all three of Plaintiff's claims should be dismissed.

## STATEMENT OF UNCONTESTED FACTS

On April 13, 2017, Plaintiff Gray Television Group, Inc. ("Plaintiff") filed a complaint in the Eastern District of New York alleging that Defendants had committed fraud through the actions of Defendants Nick Prueher ("Prueher") and Joe Pickett ("Pickett"), who sent a press release to WEAU's *Hello Wisconsin*. (Ex. F.) The press release generally described the characters Chop & Steele as well as what they would do when they appeared on *Hello Wisconsin* if invited. (Ex. F.) In all correspondence with WEAU before and after their appearance, Pickett and Prueher remained in character as shown by the two "bump shots" filmed by WEAU and used to tease their upcoming segment as well as correspondence with anchor Tyler Mickelson. (Statement of Material Facts "SMF" ¶ 5.) Plaintiff's Complaint also asserted a claim of copyright infringement on the grounds that Defendants had copied the appearance of Chop & Steele on *Hello Wisconsin* and incorporated it into Defendant Found Footage Festival's live shows and a

1

DVD. (Compl. ¶¶ 81-90, ECF No. 1.) Defendants have incorporate snippets of Chop & Steele's appearance on *Hello Wisconsin* into one DVD, Volume 8, and a video shown at some of the Found Footage Festival live shows since February 2017. (SMF ¶¶ 1-3.) The DVD contains 5 clips from WEAU's *Hello Wisconsin* that range in length from roughly 6 seconds to 18 seconds and total roughly 66 seconds. (SMF ¶ 1.) These clips are interspersed in a montage of footage showing Chop & Steele appearing on other morning news television programs. (SMF ¶ 1.) The video shown at some but not all of the Found Footage Festival live shows similarly uses five brief clips ranging in length from roughly 6 seconds to 20 seconds and totaling roughly 80 seconds. (SMF ¶ 3.) Plaintiff's *Hello Wisconsin* morning show is a 2-hour television program. (Ex. H.)

## ARGUMENT

### I.     Plaintiff's Claim for Fraud Fails

To maintain a claim for fraud under New York law, a party must allege:  (1) a misrepresentation or omission of a material fact; (2) with knowledge of its falsity; (3) made for the purpose of inducing the recipient to rely upon it; (4) justifiable reliance on the material misrepresentation or omission on the part of the recipient, and (5) injury sustained as a result of that reliance.  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997), *aff'g*, 927 F. Supp. 650 (S.D.N.Y. 1996); *Johnson v. Riverhead Cent. Sch. Dist.*, 14-CV-7130 (DRK)(AKT), 2015 WL 6438788, at *6 (E.D.N.Y. October 21, 2015); *Innovation Ventures*, 12-CV-5354 (KAM)(RLM), 2014 WL 1311979, at *7; *Antidote Intern. Films, Inc. v. Bloomsbury Pub., PLC*, 467 F. Supp. 2d 394, 400 (S.D.N.Y. 2006). Plaintiff cannot support a claim that it justifiably relied upon any misrepresentation made by Defendants, that Defendants intended to induce reliance on any alleged material misrepresentation, or that Defendants made any misrepresentation or omitted a material fact.

2

A. **Plaintiff Cannot Show Justifiable Reliance on Any Alleged Material Misrepresentation or Omission of a Material Fact**

To prevail on a claim of fraud under New York law, a plaintiff must prove that it reasonably relied on any alleged material misrepresentations made by defendants. *Schlaifer*, 119 F.3d at 98. "Circumstances may be so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false, and that the plaintiff cannot reasonably rely on those representation, but rather must 'make additional inquiry to determine their accuracy.'" *Innovation Ventures*, 12-CV-5354 (KAM)(RLM), 2014 WL 1311979 at *8 (citing *Schlaifer*, 119 F.3d at 98). If a party "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, [it] must . . . use . . . those means, or [it] will not be heard to complain that' it reasonably relied on the alleged misrepresentations. *Id.* The Second Circuit recognizes that when a sophisticated party has access to information but fails to take advantage of that access, "New York courts are particularly disinclined to entertain claims of justifiable reliance." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984).

In *Grumman*, the Second Circuit affirmed the district court's grant of summary judgment as to the issue of justifiable reliance because undisputed evidence demonstrated that the plaintiff was a sophisticated party entering into a financial transaction and the alleged misrepresentations could have been easily tested by information available to the plaintiff. *Id.* at 737-38. The Second Circuit was unpersuaded by the plaintiff's argument that its duty to investigate was contingent on "whether the information required to confirm or disprove the validity of" the alleged misrepresentations "was peculiarly within [the defendant's] knowledge." *Id.* at 738. The Court noted that the cases cited by the plaintiff in support of its argument all involved "allegedly undisclosed information . . . only known by—and indeed only available to—the defendants, and

incapable of discovery by the plaintiff, no matter how diligent its investigation." *Id.* In this case, a simple inquiry on Google would have immediately revealed that the characters Chop & Steele were not actually strongmen.

In *Schlaifer*, the Second Circuit affirmed Judge Chin's grant of defendants' motion for *judgment as a matter of law* after a "jury found that all three defendants had fraudulently induced [plaintiff] to enter into a licensing agreement with" the estate of the artist Andy Warhol. 119 F.3d at 101, *aff'g*, 927 F. Supp. at 651-52. Judge Chin based his decision on evidence that showed the plaintiff "knew or should have known that the representations that the [defendants] controlled all the rights to all of Warhol's works could not have been true. Yet [plaintiff] entered into [a] licensing agreement without conducting any due diligence and without making any reasonable effort to determine the truth or falsity of the purported representations." 927 F.3d at 652. As with almost all fraud claims, this case again dealt with a large financial component, which exceeded $4 million. *Id.* at 96. Judge Chin set aside the jury's verdict in favor of plaintiffs who relied on defendants' assurances in an agreement that the Warhol estate "held the rights to all of Warhol's 'Existing Artworks,' and defined that term to mean all works known to exist when the Agreement was signed." *Id.* at 100. Several red flags made copyright protection of Warhol's artwork suspect, including the volume of works Warhol produced and the fact that a cursory review of a portion of the agreement at issue listing several works by Warhol showed many with no copyright notices or ownership by third parties. *Id.* Reviewing the record, the Second Circuit found that "Judge Chin did not err by ruling that no rational juror could have concluded that [the plaintiff] reasonably relied on the [defendants'] misrepresentations." *Id.* at 101. The Court affirmed the principle that alleged misrepresentations may be suspicious enough to require

further investigation for a plaintiff to show reasonable reliance in the context of fraud under New York law. *Id.* at 98.

Here, the record shows that the correspondence received by Plaintiff presented many red flags without reference to anything outside the four corners of the documents. Even without these red flags, a reasonable party working as a news anchor would have conducted basic due diligence. The name of the characters' purported agent, Jerry Chubb, is enough to raise suspicions or clue a reasonably prudent reader in to the nature of Chop & Steele's act given that Chop & Steele are pitched as a humorous strongman duo. The name of Chop & Steele's tour as identified in their press release, Give Thanks 4 Strengths, also strikes a humorous tone. Given the humor evident on the face of all correspondence from Jerry Chub to potential hosts for Chop & Steele, any reasonably prudent person working in a news room would have either known that Chop & Steele would deliver the humorous performance promised in their press release, or they would have done basic due diligence such as looking to see if the domain *givestrengths4thanks.com* contained any content. The press release also stated that Chop & Steele were "fan favorites" on *America's Got Talent*. This claim was calculated to arouse suspicion, and any party with access to the internet could prove or disprove this outlandish claim in minutes.

Fraud is ill-suited for a claim where the alleged damages are either non-existent or based on disingenuous claims of lost licensing fees. Defendants in this case are artists and curators. They are not sophisticated parties like Plaintiff or the parties cited in the cases above. Within the Second Circuit, the only relatively recent case with facts involving an artist as a defendant facing a claim sounding in fraud centers not just on the breathtaking book that shook the firmaments of the literary establishment and deeply affected several recent high school graduates from the class

of 2000, namely, *Sarah*, published under the name "J.T. Leroy." JT Leroy, *Sarah* (Bloomsbury 2001) (2000). In *Antidote International Films*, the plaintiff alleged fraud against the publisher of the critically acclaimed novel *Sarah* as well as its author, Laura Albert, who wrote and published the book "under the name of J.T. Leroy, a persona" the plaintiff alleged she created. 467 F. Supp. 2d at 396. There, the defendants not only constructed an enormous edifice to support their alleged misrepresentation, they actively thwarted attempts at uncovering the truth with elaborate schemes that persisted for years. *Id.* at 396-97. Moreover, the defendants continued to maintain that Leroy was an actual person while negotiating three one-year option periods on the film rights for the novel, for which the plaintiff paid $15,000 each. *Id.* at 397. As described below, *Antidote International Films* is still a case centering on the defendants' use of myriad misrepresentations to obtain a significant amount of money from the plaintiff. It also shows defendants who actively stymied the plaintiff's due diligence efforts. In the present case, Plaintiff can neither show such attempted due diligence nor any actions on the part of Defendants approaching the extent of the alleged misrepresentations made by Defendants.

The plaintiff in *Antidote International Films*, alleged and provided in its pleadings numerous examples of press releases, claims on websites, book blurbs, and other marketing asserting that J.T. Leroy was a real person and that *Sarah* drew heavily on his personal experiences. *Id.* at 396. The first amended complaint contained specific examples showing that the defendant publisher's website contained a page of "author information" about Leroy stating that he "embarked upon a roadtrip across America at the age of thirteen with his mother," who "abandoned him when they reached San Francisco," which led him "into a spiral of drug abuse and prostitution." *Id.* (citation omitted). "Similarly, [the publisher's USA branch's] website [said] that J.T. Leroy wrote most of the stories in a collection published after *Sarah* 'between the

6

years of '94 & '97, at the time never thinking of publication, but needing to write to survive emotionally during a very difficult period of his life." *Id.* (citation omitted). In one press release provided by the plaintiff, the defendant publisher stated "[t]he world of *Sarah* is one which the average person will never experience. Under Leroy's expert hand what initially seems deviant and strange becomes heartbreaking and wonderful as a boy's feelings and struggles with identity become universally recognized." *Id.* (citation omitted). In *another* press release from the defendant publisher and presented in the plaintiff's pleadings, the defendant wrote that "JT Leroy first burst on the scene with his debut novel *Sarah*, which astonished reading audiences with a literary flair paired with heartbreaking, semi-autobiographical writing." *Id.* (citation omitted). Plaintiff in this case alleged that during and after the negotiation of the option contracts for the film rights to *Sarah*, the defendants took various steps to convince the plaintiff that Leroy was a real person, including:  presenting the plaintiff "with a false IRS Form W-9 signed by J.T. Leroy on August 1, 2003," "arrang[ing] a meeting between J.T. Leroy and plaintiff, at which [a third party] played the part of Leroy," "executed the contract with plaintiff in the name of J.T. Leroy," and "communicated by phone, fax and email with plaintiff in the name of J.T. Leroy." *Id.* at 397. In the fall of 2005, five years after defendants' initial publication of *Sarah* and after its contracts with plaintiff were in place, plaintiff alleged that a journalist first claimed that J.T. Leroy did not exist. *Id.* Plaintiff alleged that it stopped working on the film adaptation when this 2005 article revealed that Leroy did not exist. *Id.* Plaintiff also alleged that the director of the film lost interest in the project after the revelation and that "[d]efendants' fraud has made it virtually unthinkable that a distributor or a financier would ever invest any significant money into backing a project based solely on *Sarah*" because "[t]he book is discredited and a joke in the eyes of many." *Id.* Plaintiff further alleged that the "'value' of *Sarah* 'was always predicated on the

7

connection between "Leroy," his experiences, and the literary works.'" *Id.* (citation omitted). At the time of the lawsuit, defendants continued to market and promote the character J.T. Leroy, including on the website *www.jtleroy.com*. *Id.*

In this case, Plaintiff relies upon two press releases and email exchanges that are obviously and demonstrably untrue. For this reason, Plaintiff's claim for fraud fails.

### B.    Plaintiff Cannot Show a Misrepresentation or Omission of a Material Fact

"[U]nder New York law, a duty to disclose material facts is triggered . . . where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Grumman*, 748 F.2d at 738-39. "[A] party's knowledge is not superior where the relevant information 'was either a matter of public record, was not pursued by plaintiffs, or was disclosed at least in part . . . .'" *Id.* at 739 (citation omitted). As discussed above, any relevant fact was immediately available to Plaintiff and should have been discovered by any reasonable party similarly situated. All of the alleged misrepresentations are nothing more than affirmative representations about the characters Chop & Steele, most of which are frivolous and some of which are red flags putting the recipients on notice of the nature of the representations made in character by Defendants, which triggered Plaintiff's duty to perform basic due diligence. A Google search would have been enough due diligence to discovery the nature of Defendants' act, which they performed as advertised. Moreover, Defendants, when they appeared as Chop & Steele, remained in character throughout their interactions with each television show and its staff. Chop & Steele provided the show that was promised.

**C.    Plaintiff Cannot Show that Defendants Made Any Misrepresentations of Fact or Omitted Any Facts with the Requisite Fraudulent Intent**

"Fraud must be pled with particularity . . . which requires that the plaintiff '(1) detail the statements (or omissions) . . . are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) (citation omitted), *aff'g in the relevant part*, No. 02 Civ.1312(LMM)(GWG, 2003 WL 21305355, at *2-3 (S.D.N.Y. June 5, 2003). A plaintiff "'must allege facts that give rise to a strong inference of fraudulent intent,' which may be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). "Motive would entail concrete benefits that could be realized by one or more of the false statements [or omissions] alleged." *Shields*, 25 F.3d at 1130. "Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Id.*

In *Eternity Global*, the plaintiff alleged that the defendant's "assurances that [the plaintiff] would have a liquid secondary market for [three credit swaps at issue] and that [defendant] would provide [plaintiff] with a continuing flow and supply of secondary market pricing to offset [plaintiff's] risks of investment" sustained a claim of fraud. No. 02 Civ.1312(LMM)(CWG, 2003 WL 21305355 at *1. The defendant "did not honor these alleged promises to provide a secondary market for the three swaps despite repeated requests from" the plaintiff. *Id.* Although the plaintiff alleged that the defendant "had no intention at the time those statements [described above] were made to accommodate any pre-termination requests by [plaintiff] to sell or liquidate its positions in the [contemplated swaps]," the district court found

that such an allegation "simply [was] not sufficient to establish the requisite 'strong inference of fraudulent intent'" and dismissed the fraud claim on that basis alone. *Id.* at \*3. In affirming this dismissal, the Second Circuit stated that the complaint at issue lacked "particularized facts to support the inference that the defendants acted recklessly or with fraudulent intent." 375 F.3d at 187. In its first complaint, the plaintiff in *Eternity Global* included "no specific allegation that [the defendant] had already formulated an intent not to perform when the alleged misrepresentation was made." No. 02 Civ.1312 (LMM), 2002 WL 31426310, at \*5 (S.D.N.Y. Oct. 29, 2002).

Here, the record is unambiguous. Defendants represented that they would "discuss ways to unify people, how to prevent bullying, and how to generally be a 'good dude.'" (Ex. B.) That is exactly what the characters Chop & Steele did.

In *Shields*, the plaintiff satisfied the pleading requirements by stating the time, place, speaker, and occasionally the content of the alleged misrepresentations, which, as with nearly all fraud claims, had to do with an underlying financial transaction. 25 F.3d at 1128-29. Nevertheless, the Second Circuit held that the plaintiff failed to allege fraud because it had not shown facts demonstrating that the defendant had both the fraudulent intent and motive to benefit from any alleged misrepresentation. *Id.* at 130.

Here, the facts of record show that Defendants lacked the motive and opportunity to benefit from the alleged misrepresentations. Defendants were not paid for their appearances, and they used roughly one minute of footage, split into five clips, from WEAU's *Hello Wisconsin*. They did not make any misrepresentations with an intent to defraud Plaintiff.

In *Antidote International Films*, the detailed fact pattern showing a pattern of material misrepresentations, concerted efforts to thwart any due diligence by the plaintiff, "as well as

10

defendant's alleged motive to defraud and its clear opportunity to do so" were viewed as strong circumstantial evidence of conscious misbehavior or recklessness that gave rise to a strong inference of fraudulent intent. 467 F. Supp. 2d at 400. There, the motive to defraud was clear, the defendants were actively negotiating contracts with the plaintiff to option a novel whose value many believed rested in its purported author's youth, harsh life experiences, and general persona. *Id.* at 397.

Here, it cannot be disputed that Prueher and Pickett were, at all relevant times, in character when dealing with Plaintiff. The characters Chop & Steele appeared at Plaintiff's station just as they appeared on the air. Not only do the red flags intentionally planted in all of Defendants' correspondence with WEAU and WSAW undermine any claim that obvious misrepresentations were made with an intent to defraud Plaintiff, Prueher and Pickett's appearance in character before WEAU put them on live television gave Plaintiff ample opportunity to scrap the brief segment. It did not. Instead, WEAU filmed two bumpers, or short segments, used to introduced and tease the later segment with the characters Chop & Steele. (SMF ¶ 5.)

### D.    Plaintiff Cannot Show Damages of the Type Fraud Prevents

Under New York law, the damages suffered from an alleged fraud "must be the direct, immediate, and proximate result of the fraudulent misrepresentation." *Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 307 (2d Cir. 1986) (citations omitted). Under New York law, damages for fraud are limited to "the actual pecuniary loss sustained as the direct result of the wrong." *AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 Fed.Appx. 2, 5 (2d Cir. 2016). New York law does not allow recovery for the loss of value that might have been realized in a hypothetical exchange that never took place. *Id.* at 6.

In this case, Plaintiff's allegations of damages are strain credulity. Plaintiff's staff had ample time to deny Defendants their brief appearance on the WEAU show in question but did not avail themselves of that option. Further, the allegation that Defendants appropriated Plaintiff's studio also fails to state any damages. The WEAU staff chose to have Chop & Steele on their show and the characters performed as advertised. Chop & Steele were not paid. Plaintiff has offered no documents in support of its claim to have been damaged despite a promise to do so after a reasonable search in its September 13, 2017 responses to Defendants' 25 document requests. Since Plaintiff's assertion of damages appears to rely on its copyright claim, it is not only too attenuated to properly claim damages for fraud under New York law but also fails because Plaintiff's copyright claim fails. In either case, because damages are an essential element of fraud under New York law, Plaintiff cannot sustain a claim for fraud. Defendants' motion for partial summary judgment should be granted.

## II.      Plaintiff's Copyright Infringement Claim Fails

The facts of record are well established and not at issue. As stated in the accompanying Statement of Material Facts, Defendants incorporated roughly one minute of footage, split into five clips, from Defendant's 2-hour long show into their DVD, Volume 8. Similarly, they used roughly 80 seconds of footage from Chop & Steele's appearance on *Hello Wisconsin*, split into five clips, in a video that they sometimes use at Found Footage Festival live shows. (SMF ¶¶1-3.)

### A.  There is No Colorable Claim of Copyright Infringement Once Fair Use is Considered

"[C]opyright law recognizes the needs for 'breathing space'" and "a defendant who otherwise would have violated one or more of the[] exclusive rights [granted by the Copyright Act of 1976] may avoid liability if he [or she] can establish that he [or she] made 'fair use' of the

copyrighted material." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014). When evaluating whether a particular use is fair "the factors to be considered shall include":

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  Though mandatory, these factors are non-exclusive, and a defendant need not establish that each of the four mandated factors weighs in its favor.  *Swatch*, 756 F.3d at 81. In fair use analysis "we must engage in 'an open-ended and context-sensitive inquiry.'" *Id.* (quoting *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006)). "All [of the factors] are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).  "The ultimate test of fair use . . . is whether the copyright law's goal of 'promoting the Progress of Science and useful Arts,' U.S. Const., art. I, § 8, cl. 8, would be better served by allowing the use than by preventing it." *Blanch*, 467 F.3d at 251 (citation omitted).

## 1.    First Factor:  The Purpose and Character of the Use

In *Campbell*, the Supreme Court described this factor stating:

> The central purpose of this investigation is to see . . . whether the new work merely 'supersedes the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative."

13

510 U.S. at 579 (citing Leval, *Toward a Fair Use Standard*, 103 Harv.L.Rev. 1105, 1111

(1990)). The Second Circuit has also cited Leval's seminal work on fair use favorably explaining

that if a "secondary use adds value to the original—if [protectable expression in the original] is

used as raw material, transformed in the creation of new information, new aesthetics, new

insights and understandings—this is the very type of activity that the fair use doctrine . . .

protect[s] for the enrichment of society." *Blanch*, 467 F.3d at 251-52 (quoting Leval, *supra*, at

1111). The fact that a use is commercial in character is not conclusive as "[n]o man but a

blockhead ever wrote, except for money." *Campbell*, 510 U.S. at 584 (citing 3 Boswell's Life of

Johnson 19 (G. Hill ed. 1934)). There is no requirement that a defendant's work comment on the

original or its author in order to be considered transformative. *Cariou v. Prince*, 714 F.3d 694,

706 (2d Cir. 2013). A defendant's secondary work may be a fair use "even if it serves some

purpose other than those (criticism, comment, news reporting, teaching, scholarship, and

research) identified in the preamble to the statute." *Id.* When a work is transformative, it should

be protected so that "the goal of copyright, to promote science and the arts, is generally

furthered." *Blanch*, 396 F. Supp. 2d at 480 (citing *Campbell*, 510 U.S. at 579).

In *Blanch*, the Second Circuit found the use of the plaintiff's photograph in a collage

transformative because of "[t]he sharply different objectives that [the defendant] had in using,

and [the plaintiff] had in creating" the collage and photograph, respectively, at issue.  467 F.3d at

252. When viewing the plaintiff's photograph and the collage in which the defendant placed it,

the Second Circuit held that the test for whether the defendant's use of plaintiff's photograph in a

collage was transformative was whether the collage "merely supersede[d] the objects of the

original creation, or instead adds something new, with a further purpose or different character,

altering the first with new expression, meaning, or message." *Id.* at 253 (citing *Campbell*, 510

14

U.S. at 579). The court found the use of a photograph in a collage transformative stating that "[t]he test almost perfectly describe[d defendant's] adaptation:  . . . the use of a fashion photograph created for publication in a glossy American 'lifestyles' magazine . . ." with visual contextual changes and "crucially, [an] entirely different purpose and meaning." *Id.*

In this case, there can be no doubt that Defendants use of a few seconds of Plaintiff's 2-hour news program in a montage, the video equivalent of a collage, is for an entirely different purpose and meaning.

Since the Supreme Court's decision in *Campbell*, courts have recognized that parody "[l]ike less ostensibly humorous forms of criticism, . . . can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one." 510 U.S. at 579. A parody "needs to mimic an original to make its point, and so has some claim to use the creation of its victim's imagination . . . ." *Id.* at 580.

In this case, Defendants set out to parody a medium. By sending out obviously fake press releases and appearing on morning news shows that failed to do any due diligence, Defendants aimed their parody of the morning news show format only at those shows ripe for criticism. WEAU became one of their few targets by failing to conduct any reasonable due diligence. Defendants appeared in character at the WEAU studios, and behaved just outrageously enough to make it obvious to viewers that although they were presented as experts on WEAU, they had not been vetted. Defendants appeared for a segment that lasted a few minutes, allowed WEAU to film short bumpers to run and tease the segment *well before* they made their appearance on the air, and then used roughly thirty seconds from the entire show split up into even briefer clips that were spliced together to create a montage of all of the shows that allowed them to make an appearance without conducting any reasonable due diligence. By cutting up and mixing a few

15

seconds from each show into a montage, Defendants created a humorous short video that immediately conveys how easy it is to walk onto a television news show. The humor, in fact, is derived from exactly that point.

Even if the Court finds that Defendants' participatory creation of the raw material for a parodic montage does not fit squarely within the framework for analyzing parodies in this context, "[t]his is not a case in which defendants attempted to usurp plaintiff's material in order to 'avoid the drudgery in working up something fresh.'" *Kane v. Comedy Partners*, No. 00 CIV. 158(GBD), 2003 WL 22383387, at *4 (S.D.N.Y. Oct. 16, 2003), *aff'd,* 98 F. App'x 73 (2d Cir. 2004) (quoting *Campbell*, 510 U.S. at 580). In *Kane*, the court considered The Daily Show's use of a brief video clip from plaintiff's public access television show in a montage as well as a commercial for The Daily Show that, in the court's estimation, was not a parody because "did not involve an altered imitation of a famous work but the presentation of an obscure, original work in a mocking context." *Id.* at *4. Even there, the court held that The Daily Show's presentation of the video clip of plaintiff's public access show, unaltered, "sought to critically examine the quality of plaintiff's public access television show." *Id.* The court therefore held that "the first factor of the fair use inquiry, purpose and character of the use, strongly favors defendants." *Id.*

In this case, Defendants actively altered each show they appeared on by virtue of their appearances. Even if that alteration is not considered, however, the use of a few seconds of video from Plaintiff's show in a montage mocking the morning television news format and Plaintiff's show specifically critically examines the quality of Plaintiff's television show. For these reasons, the first factor strongly favors Defendants.

### 2.      Second Factor:  The Nature of the Copyrighted Work

The second factor looks at "the nature of the copyrighted work." 17 U.S.C. § 107(2).

Some works are closer to the core of intended copyright protection than others. *Campbell*, 510

U.S. at 586.

> Two types of distinctions as to the nature of the copyrighted work
> have emerged that have figured in the decisions evaluating the
> second factor: (1) whether the work is expressive or creative, such
> as a work of fiction, or more factual, with a greater leeway being
> allowed to a claim of fair use where the work is factual or
> informational, and (2) whether the work is published or
> unpublished, with the scope for fair use involving unpublished
> works being considerably narrower.

*Blanch*, 467 F.3d at 256 (citing 2 Howard B. Abrams, *The Law of Copyright*, § 15:52 (2006)). In

*Swatch*, the Second Circuit held that the plaintiff's underlying work deserved less protection

because it was factual in nature. 756 F.3d at 87. The Second Circuit went on to hold that,

although the plaintiff's work was "technically unpublished under the statutory definition," the

factual nature of the plaintiff's work pushed this factor in favor of fair use. *Id.* at 88 ("This is not

the first time that we have found that the second statutory factor favors fair use even though the

work in question was technically unpublished under the statutory definition . . . ." *Id.* (citations

omitted). Even when the Second Circuit and courts within its jurisdiction have considered

underlying works that are inarguably creative, expressive works entitled to strong protection

under copyright law, this factor is of limited usefulness when the underlying work is published

and used for a transformative purpose. *Blanch*, 467 F.3d at 257; *Kane*, No. 00 CIV. 158(GBD),

2003 WL 22383387 at *5; *cf. Campbell*, 510 U.S. at 586.

In this case, Plaintiff's program is a morning news show and is more factual or

informational and so entitled to less protection than a creative work of fiction. Moreover,

Plaintiff's work was published before Defendants used a few seconds of Plaintiff's program in a

montage. This factor therefore weighs in favor of fair use. Even if the Court determines that there is a legitimate issue of fact as to whether Plaintiff's morning news show is more creative or more factual in nature, this factor does not help Plaintiff in its argument that Defendants' use of a few seconds of its morning news show in a dramatically transformative montage is not fair use. This factor weighs in favor of fair use, or, at worst, it does not weigh against fair use.

**3.    Third Factor:  The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole**

The third factor looks at "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). "[T]he extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. The question is "whether 'the quantity and value of the materials used are reasonable in relation to the purpose of the copying.'" *Swatch*, 756 F.3d at 89 (quoting *Campbell*, 510 U.S. at 586).

In *Swatch*, the Second Circuit looked at a defendant who used the entirety of the plaintiff's work and found that while use of the entire underlying work generally weighs against fair use, "the public interest in the information contained in [plaintiff's work] [was] 'better served by the dissemination of that information in its entirety, including the incidents of oral speech that do not translate onto the page but color the purely factual content.'" 756 F.3d at 90 (citation omitted). In *Blanch*, the Second Circuit found that the defendant did not copy the underlying photograph "excessively, beyond [the defendant's] 'justified' purpose for doing so in the first place . . . ." 467 F.3d at 257. In *Kane*, the defendant used a two-second clip from plaintiff's twenty-nine minute show. No. 00 CIV. 158(GBD), 2003 WL 22383387 at *5. The defendant in that case used the clip several times during its program, including as an introduction to the segment in which it was featured with other similar video clips, and in a commercial for defendant, The Daily Show. *Id.*

18

In this case, Defendants used Because Defendants only used a miniscule amount of Plaintiff's underlying work, this factor weighs in favor of fair use. In light of Defendants' purpose in using such a small portion of Plaintiff's asserted work, this factor weighs heavily in favor of fair use.

### 4.   Fourth Factor:  The Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work

The last statutory factor that must be considered is "the effect of the [defendant's] use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). When analyzing this factor, the Second Circuit is not concerned about whether the secondary use "suppresses or even destroys the market for the original or its potential derivatives, but whether the secondary use *usurps* the market of the original work." *Blanch*, 467 F.3d at 258 (citation omitted) (emphasis added). "Where the secondary work serves a fundamentally different function, such as to present an opposing viewpoint, there is little risk that the secondary work will supplant the original." *Kane*, No. 00 CIV. 158(GBD), 2003 WL 22383387 at *6 (citing *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1264 (2d Cir. 1986)). This statutory factor does not take into account any diminished interest in the original work that results from a well-executed critique. *Id.* (citing *Campbell*, 510 U.S. at 591-92 ("A lethal parody, like a scathing review, kills demand for the original but does not produce a harm cognizable under the Copyright Act")). Even in *Kane*, where both plaintiff's public access show and the defendant's television show, The Daily Show, were both comedies, the court found that "it cannot be credibly argued that defendants' use of" a miniscule amount of plaintiff's show "would have the effect of siphoning away demand for her comedy routine." *Id.* at *6.

Here, where Defendants have used an insignificant amount of the WEAU footage to mock Plaintiff and demonstrate to Defendants' audiences that they should not trust everything

they see on television, there is no credible argument that Defendants' use of Plaintiff's work causes any harm to Plaintiff that is cognizable under the Copyright Act.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their motion for partial summary judgment as to Plaintiff's claims for copyright infringement and fraud be granted. Because a claim for conspiracy may not stand without an underlying offense, Defendants also request that their motion for partial summary judgment be granted as to Plaintiff's third claim as well.

Dated:   October 3, 2017
         New York, New York

                                    THE LAW OFFICES OF
                                      ANDERSON J. DUFF, PLLC
                                      *Attorneys for Defendants*

By: _____

                                      Anderson J. Duff
                                      244 5th Avenue, Suite 2230
                                      New York, New York 10001
                                      (t) 212.996.4103
                                      (f) 212.996.5863
                                      anderson@revisionlegal.com

21

# CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2017, I served copies Defendants' Motion for Partial

Summary Judgment, Statement of Material Facts, and Memorandum in Support on the following

attorneys via email and through copies mailed through the USPS earlier this evening:

> Charles D. Tobin
> Adrianna C. Rodriguez
> 1909 K Street, NW
> 12th Floor
> Washington, DC 20006-1157
> (t) 202.661.2200
> (f) 202.661.2299
> tobinc@ballardspahr.com
> rodriguezac@ballardspahr.com

Anderson J. Duff